Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2754 and 02 C 3541 | **DATE** | 3/6/2003 |
| **CASE TITLE** | Majorie Lynn Mungo vs. Maureen Sullivan Taylor | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The bankruptcy court's order as amended is affirmed in part and reversed in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | MAR 7 - 2003 |
| | Notified counsel by telephone. | date docketed |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| TH ✓ | courtroom deputy's initials | 03 MAR -7 AM 7:44 |
| | | Date/time received in central Clerk's Office / mailing deputy initials |

Document Number: 42

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION



| | |
|---|---|
| IN THE MATTER OF: ) <br> ) <br> MARJORIE LYNN MUNGO, ) <br> ) <br> Debtor. ) <br> _____ ) <br> ) <br> MARJORIE LYNN MUNGO, ) <br> ) <br> Plaintiff-Appellant, ) <br> ) <br> v. ) <br> ) <br> MAUREEN SULLIVAN TAYLOR, ) <br> ) <br> Defendant-Appellee. ) | No. 02 C 2754 <br> No. 02 C 3541 (consolidated) <br><br> MAR 7 - 2003 |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge

Debtor-Plaintiff Marjorie Lynn Mungo appeals from the October 5, 2001 judgment of the bankruptcy court (as amended on March 22, 2002), and Creditor-Defendant Maureen Sullivan Taylor cross appeals. For the reasons discussed below, the bankruptcy court's order as amended is affirmed in part and reversed in part.

## BANKRUPTCY PROCEEDINGS

On July 14, 2000, Mungo filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and listed Taylor as a disputed creditor. Taylor was a disputed creditor by virtue of her representation of Mungo in state court divorce proceedings. Mungo objected to Taylor's proof of claim, alleging that Taylor had coerced Mungo into signing a marital settlement, and Mungo filed an adversary proceeding against Taylor, alleging legal malpractice.

42

The bankruptcy court consolidated the objection to the claim and the adversary proceeding and held a four and a half day bench trial.

On October 5, 2001, Judge Wedoff held that Mungo had established a number of breaches of duty by Taylor, including her failure to complete discovery, failure to obtain complete financial information prior to completing the pretrial statement, failure to seek interim attorney's fees, failure to give thorough advice regarding the consequences of the settlement agreement, and her paralegal's instruction to Mungo to offer false testimony. Nonetheless, Judge Wedoff entered judgment in favor of Taylor in the adversary proceeding because he found that Mungo had failed to provide evidence of damages resulting from any of these breaches. (*See* R. 1-1, Record, Vol. VIII, October 5, 2001 Ruling.)

Mungo filed a motion for reconsideration, and on March 22, 2002, Judge Wedoff amended his ruling on the adversary complaint to award Mungo damages in the amount of $7,340.43. (*See* R. 1-1, Record, Vol. I, Mar. 22, 2002 Mem. of Decision.) Mungo and Taylor both filed a bill of costs in the adversary case, and on April 17, 2002, Judge Wedoff entered an order granting Taylor's bill of costs and denying Mungo's bill of costs. Taylor filed a timely notice of appeal from the amended ruling on the adversary action, and Mungo filed a timely appeal from the order denying her bill of costs.

On the claim objection, Judge Wedoff sustained Mungo's objection in part, reducing Taylor's proof of claim from $25,224.28 to $10,641.38. (*See* R. 1-1, Record, Vol. VIII, October 5, 2001 Ruling.) Mungo sought to amend or alter the allowance of Taylor's claim, but that motion was denied. Mungo subsequently filed a timely notice of appeal related to the amount of Taylor's proof of claim.

## **CURRENT APPEALS**

In accordance with Federal Rule of Bankruptcy Procedure 8006, Mungo filed and served her statement of issues to be presented on appeal, which may be summarized in these terms:

1. Whether Mungo proved damages in excess of $7,340.43;

2. Whether Mungo waived the argument that Taylor's claim for attorney's fees should be disallowed where Mungo failed to make the request during closing argument;

3. Whether the bankruptcy court erred by failing to compel testimony concerning a gift received by Mungo's former spouse just days after the divorce settlement; and

4. Whether the bankruptcy court erred by failing to award Mungo costs where she was the prevailing party at trial.

In accordance with Rule 8006, Taylor filed and served her statement of issues to be presented on appeal. These issues are as follows:

1. Whether any of Taylor's negligent acts or omissions proximately caused Mungo any damages;

2. Whether the bankruptcy court's finding that Taylor failed to give thorough advice concerning the divorce settlement was clearly erroneous;

3. Whether the bankruptcy court's finding that Taylor and her former spouse were undergoing an irreconcilable breakdown in August 1997 was clearly erroneous;

4. Whether the bankruptcy court's finding that dissipated family assets were not used for legitimate family expenses was clearly erroneous;

5. Whether Mungo is entitled to damages based on a legal theory not raised until closing arguments; and

6. Whether the bankruptcy court erred by refusing to permit Mungo to testify contrary to her sworn testimony in the underlying state court divorce proceedings.

**STANDARD OF REVIEW**

In the course of a district court's decision to affirm, modify or reverse an order of the bankruptcy court, "[f]indings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. Thus, a bankruptcy court's factual findings cannot be disturbed "simply because [the district court] is convinced it would have decided the case differently." *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). Both questions of law and mixed questions of law and fact, however, are reviewed *de novo*. *See In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir. 1986).

## I.  MUNGO'S PROOF OF DAMAGES

In order to recover damages for a legal malpractice action in Illinois, a plaintiff must establish what the result would have been in the underlying action where the plaintiff's former attorney committed the alleged malpractice. *See Eastman v. Messner*, 721 N.E.2d 1154, 1158, 188 Ill.2d 404, 411 (Ill. 1999). A plaintiff need not prove to a certainty that she would have prevailed absent legal malpractice, but she must show that a victory of some sort was more likely than not in the underlying action. *See Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1032 (7th Cir. 2000); *Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*, 197 F.3d 1190, 1193 (7th Cir. 1999). In this case, the underlying action was a divorce action, and the measure of damages for Mungo's legal malpractice claim is the difference between her recovery

under the settlement agreement and what she would have recovered in the divorce action but for Taylor's legal malpractice.

Mungo attacks Judge Wedoff's analysis of the value of her underlying divorce action, arguing that he undervalued the marital estate. In a divorce action, the issues of damages and the valuation of the marital estate are factual questions to be resolved by the trier of fact. *In re Marriage of Lee*, 615 N.E.2d 1314, 1321, 246 Ill. App. 3d 628, 636 (Ill. App. Ct. 1993). Under the clearly erroneous standard, if the bankruptcy court's factual findings are plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if it would have weighed the evidence differently. *Matter of Love*, 957 F.3d 1350, 1354 (7th Cir. 1992).

Judge Wedoff began his damages analysis by calculating the value of the marital assets and determining the value of Mungo's dissipation claim. Based on the record evidence, Judge Wedoff determined that the value of the estate was $301,075.73, including the value of the dissipation claim and the value of the marital assets. Judge Wedoff determined that Mungo would have received 60% of the marital property, or $180,645.43, had the case gone to trial. Judge Wedoff then determined that the settlement agreement was worth $173,305.00, and he awarded the difference, or $7,340.43 as damages.

Mungo raises a host of challenges to Judge Wedoff's valuation of the marital estate. Specifically, she claims Judge Wedoff erred by: (1) determining that the value of the marital estate was just $301,075.73 rather than $2,130,530.30 because he ignored evidence for many of the assets in the marital estate and improperly valued others; (2) applying the wrong legal standard to her dissipation claim and improperly valuing that claim; (3) excluding gifts to the children from their grandfather when calculating the value of the marital estate; and (4) holding

5

that Taylor was barred by the doctrine of equitable estoppel from claiming a value of the marital estate less than the value Taylor claimed in the underlying divorce action in state court.

First, Mungo argues that Judge Wedoff ignored evidence for many of the assets in the marital estate. Mungo's principal evidence for these other assets was based on a pretrial statement and a settlement proposal from the underlying divorce proceeding that reflected what Mungo *expected* the evidence would show at trial. As Judge Wedoff correctly noted, however, the pretrial statement was not evidence but rather simply "a statement of position by a party as to what the evidence might show." (*See* R. 1-1, Record, Vol. VIII, October 5, 2001 Ruling at p. 8.) Likewise, the settlement proposal was not evidence of the value of the estate but rather a reflection of one litigant's views on that issue.[1] Mungo also argues that a summary exhibit, Exhibit 61, (*see id.*, Record, Vol. XIV, Exhibit 61), she prepared for trial supports her calculation of the value of the marital estate. As Judge Wedoff noted, however, Mungo failed to introduce any of the underlying evidence supposedly supporting this summary exhibit. (*See id.*, Record, Vol. I, Mar. 22, 2002 Mem. of Decision at p. 7.) Because Judge Wedoff's decision to reject the pretrial statement, the summary exhibit and Mungo's testimony was not clearly erroneous, Mungo's objection to the bankruptcy court's calculation of the value of the marital estate fails.

Mungo also challenges various specific valuations of particular portions of the marriage estate calculated by Judge Wedoff, including the value of stock in CLP Group, Inc. and the value of the marital home. Regarding the value of the stock, the relevant time for the valuation of stock is as close as practicable to the date of the trial. *See* 750 ILCS 5/503(f). Mungo argues for

---

[1] Mungo also argues that her testimony supports her claimed valuation of the marital estate. Judge Wedoff, however, disregarded her testimony as not credible and noted that her testimony simply repeated the values drawn from the settlement proposal.

a stock valuation of $160,000 prepared by an accounting firm rather than a subsequent valuation prepared by the same accounting firm of just $40,000. Given the evidence that the stock declined in value because of the "generally unprofitable nature of the company operations," Judge Wedoff's decision to base his damages calculation on the subsequent $40,000 valuation was not clearly erroneous.[2] Likewise, regarding the value of the marital estate, Judge Wedoff's use of an appraisal offered into evidence by Taylor to value Mungo's marital home, rather than Mungo's testimony, which he deemed not credible, was not clearly erroneous.

Second, Mungo claims that Judge Wedoff improperly valued her dissipation claim during the period that her marriage was irretrievably broken. Under Illinois law, dissipation is "the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at the time that the marriage is undergoing an irreconcilable breakdown." *In re Marriage of Cerven*, 742 N.E.2d 343, 348, 317 Ill. App. 3d 895, 900 (Ill. App. Ct. 2000). Mungo claims that Judge Wedoff applied the wrong standard because he measured the dissipation claim from late in August 1997 when he determined that the marriage suffered irreconcilable breakdown. (*See* R. 1-1, Record, Vol. VIII, October 5, 2001 Ruling at p. 8.) Mungo suggests that her marriage (like all others) "undergo[es] irreconcilable breakdown" before it actually suffers such an irreconcilable breakdown. Thus, Mungo argues that Judge Wedoff should have measured her dissipation claim from 1995 when her marriage started to undergo an irreconcilable breakdown rather than late August 1997 when the breakdown was essentially complete.

---

[2] Mungo suggests that evidence of the $40,000 valuation should not have been allowed because the trial judge in the underlying divorce action originally barred that valuation. She argues that the revised valuation later came in during the divorce action only because of Taylor's negligence. There is no evidence, however, that connects Taylor's negligence to the admissibility of the $40,000 valuation.

7

Even assuming that Judge Wedoff applied the wrong legal standard to her dissipation claim, however, Mungo's evidence supporting the 1995 date is, as he noted, very limited. Moreover, Mungo's assertions of the onset of irreconcilable breakdown during the period between 1995 and 1997 are belied by her admission that when she and her former husband separated in 1997 it was intended to be for just "a little while," suggesting that the couple hoped to reconcile. Indeed, Mungo testified that she and her former husband attempted to reconcile as late as March of 1998. Given these admissions, Judge Wedoff's decision to measure the dissipation from 1997 was not clearly erroneous -- regardless whether he applied the wrong legal standard. It was, at most, harmless error.

Even if Judge Wedoff was correct to date the dissipation claim from 1997, Mungo argues that the bankruptcy court improperly valued that claim by omitting the swimming pool from this calculation. As Taylor points out, however, there is no evidence that the pool was constructed using marital funds, which is an essential element of a dissipation claim. Moreover, Judge Wedoff found that the pool was not "unrelated to the marriage" -- another element of a dissipation claim. (*See* R. 1-1, Record, Vol. I, Mar. 22, 2002 Mem. of Decision at p. 10.) Finally, the bankruptcy court noted that the pool was itself subsumed into the valuation of the marital estate. (*Id.*) Thus, Judge Wedoff's specific calculation of the value of the dissipation claim was not clearly erroneous.

Third, Mungo argues that Judge Wedoff improperly excluded gifts to her children from their grandfather when calculating the value of the marital estate. Under Illinois law, funds in the marital estate are presumed to be marital property unless that presumption is rebutted by proof of a gift. *In re Lee*, 615 N.E.2d 1314, 1323, 246 Ill. App. 3d 628, 639 (Ill. App. Ct. 1993); 750

8

ILCS 5/503(b)(5). Property acquired by gift is not considered marital property, and the court may set it aside in a separate trust or fund for the benefit of children.

The parties stipulate that in May and July 1997 Mungo's former husband transferred a total of $146,248.80 from the marital estate to trust accounts for their three children. The parties did not stipulate that these were marital funds but simply that the funds came from the marital account. Significantly, however, Taylor testified that the source of the funds was a gift from Mr. Mungo's grandfather. Thus, Judge Wedoff's conclusion that these funds were not part of the marital estate was not clearly erroneous. Moreover, regardless of the source of the funds, the transfer to the trust accounts occurred in May and July of 1997 -- before the beginning of Mungo's dissipation claim.

Fourth, Mungo argues that Judge Wedoff erred as matter of law because he refused to find that Taylor was barred by the doctrine of collateral estoppel from arguing that the marital estate was less than the value she claimed in the pretrial statement she submitted in connection with the underlying state court divorce action. Mungo argues that Taylor filed the pretrial statement containing an assertion concerning the value of the marital estate and that Mungo relied upon the representation. As Taylor points out, however, Mungo did not supply any evidence that she *relied to her detriment* on Taylor's representations, which is an essential element of any collateral estoppel argument. *See, e.g., Quake Const., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 1005, 141 Ill.2d 281, 310 (Ill. 1990). Mungo might have a collateral estoppel claim if, for example, she rejected a settlement offer in reliance on Taylor's statements before recovering an award or agreeing to a settlement that was somehow less. Instead, Mungo

apparently disregarded the valuation of the marital estate from the pre-trial order and accepted a lower settlement offer.

## II. MUNGO'S ATTEMPT TO COMPEL DISCOVERY RELATING TO A GIFT OR EXPECTANCY PRIOR TO THE DIVORCE

Mungo claims that within ten days of entry of the divorce decree, her former husband was gifted 4,000 shares of stock in his family's business, which was valued in the millions of dollars. Under Illinois law, such a stock gift could conceivably be considered part of the marital estate. *See* 750 ILCS 5/503(d) (one of the factors when assessing the value of the marital property includes "the reasonable opportunity of each spouse for future acquisition of capital assets and income"); *see also In re Marriage of Henke*, 728 N.E.2d 1137, 1150, 313 Ill. App. 3d 159, 176 (Ill. App. Ct. 2000).

In order to assess whether the stock gift might be considered part of the marital estate, Mungo sought to depose her former husband's siblings in order to determine when the gift was made and when her former husband learned that he was to receive it. The siblings objected to their depositions and suggested that Mungo might obtain such information by serving subpoenas for stock records or by deposing Mungo or their father. Judge Wedoff apparently agreed, because he denied the motion to compel. Mungo contends that his denial was erroneous.

Significantly, although Judge Wedoff rebuffed Mungo's attempt to depose her former husband's siblings, Mungo had the opportunity to explore the issue of the stock gift at trial. Indeed, Mungo called her former husband at trial but apparently failed to ask him any questions concerning the timing of the stock gift or when he learned about it. Thus, regardless whether Judge Wedoff's refusal to order the depositions of the siblings was erroneous, that error was

10

harmless because Mungo was not foreclosed from obtaining access to equivalent information through other discovery means. She simply chose not do so.[3]

## III. THE PARTIAL ALLOWANCE OF TAYLOR'S PROOF OF CLAIM

At the conclusion of the trial, Judge Wedoff invited argument with respect to Taylor's proof of claim. Mungo's counsel argued that the claim should not include fees incurred after Mungo filed for bankruptcy and the claim was therefore limited to approximately $10,600. Taylor's counsel agreed. Judge Wedoff then ordered:

> All right. Fine. The proof of claim would be reduced, the allowed claim would be reduced to the $10,000 [sic], the precise amount that you stated, Ms. Boynton, as of the July date, and in other respects disallowed.

(*See* R. 1-1, Record, Vol. VIII, October 5, 2001 Ruling at pp. 9-10.) Mungo moved for reconsideration, arguing that Taylor's proof of claim should not be allowed in any amount and that her counsel's admission during oral argument was simply an argument in the alternative. In rejecting this argument, however, Judge Wedoff found that "no argument was made at trial that Taylor's claim should be disallowed in its entirety and the court finds such an argument was waived." (*See id.*, Record, Vol. I, Mar. 22, 2002 Mem. of Decision Order at p. 12.)

Mungo suggests that her counsel's statements were not "crystal clear," but she acknowledges that her counsel did in fact state that Taylor's claim should be limited to amounts incurred prior to Mungo's bankruptcy filing. Nonetheless, Mungo argues that she did not waive the argument that Taylor's claim should be disallowed in its entirety because she raised the

---

[3] Moreover, Mungo's claim relating to the stock gift fails because she does not suggest that even if she had obtained the requested discovery the evidence would have supported the assertion that the stock gift was properly part of the marital estate.

11

argument in a motion for reconsideration. Arguments raised for the first time in connection with a motion for reconsideration, however, are generally deemed to be waived. *See Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1336 (7th Cir. 1992) (considering appeal in underlying litigation and stating that arguments may not be raised for the first time in Rule 59(e) motion). Accordingly, Judge Wedoff did not abuse his discretion by refusing to entertain this argument in the context of Mungo's motion for reconsideration.

## IV. MUNGO'S BILL OF COSTS

Finally, Mungo argues that Judge Wedoff erred by failing to award her costs as the prevailing party. Although Bankruptcy Rule 7054 provides that the court *may* award the prevailing costs, the courts have held that there is a rebuttable presumption that the prevailing party is entitled to costs. *Congregation of the Passion, Holy Cross Providence v. Touche, Ross & Co.*, 854 F.2d 219, 221-222 (7th Cir. 1988). Thus, "[g]enerally only misconduct by the prevailing party worthy of a penalty . . . or the losing party's inability to pay will suffice to justify denying costs." *Contreras v. City of Chicago*, 119 F.3d 1286, 1295 (7th Cir. 1997). The courts review a lower court's decision to impose costs for an abuse of discretion. *See Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 550 (7th Cir. 1999). This "discretion is narrowly confined because of the strong presumption created by [this rule] that the prevailing party will recover costs." *Contreras*, 119 F.3d at 1295.

Taylor points out that under Bankruptcy Rule 7068 a prevailing party forfeits the right to costs where that party rejects a Rule 7068 offer of judgment. On its face though, Rule 7068 applies only to costs incurred *after* the prevailing party rejects an offer of judgment. Taylor cites no authority for the proposition that a Rule 7068 offer of judgment forecloses costs incurred

12

*prior* to the rejection of the offer. Further, Taylor cites no authority for the proposition that the rejection of a Rule 7068 offer of judgment rises to the level of misconduct that would justify the denial of costs.

Taylor concedes that Mungo incurred at least $3,095.33 in costs prior to rejecting Taylor's offer of judgment. Nonetheless, Judge Wedoff denied Mungo's bill of costs in its entirety without explanation. Ordinarily the denial of costs to a prevailing party must be accompanied by an explanation of the lower court's "good reasons" for this denial. *See Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 945 (7th Cir. 1997); *Congregation of the Passion*, 854 F.2d at 222 (7th Cir. 1988). Here, Judge Wedoff failed to give any explanation for his denial of Mungo's bill of cost, and if this Court affirmed the bankruptcy court's decision in all other respects, Judge Wedoff's failure to explain the "good reasons" if any for the denial of costs would be grounds for reversal on that issue. As discussed in Section VI, *supra*, however, this Court reverses Judge Wedoff's decision in part with the effect that Mungo is no longer a prevailing party on her adversary claim and is, therefore, no longer entitled to the presumption that costs should be awarded to her.

## V. IRRECONCILABLE BREAKDOWN OF MUNGO'S MARRIAGE

Taylor argues that Judge Wedoff's ruling that Mungo's marriage was undergoing irreconcilable breakdown in August 1997 was clearly erroneous. Taylor argues that Judge Wedoff dismissed Mungo's testimony as not credible and argues that Mungo failed to provide any evidence that her marriage was undergoing irreconcilable breakdown prior to March of 1998.

13

There is evidence, however, that supports the bankruptcy court's conclusion that Mungo's marriage was undergoing irreconcilable breakdown in August 1997. Indeed, Mungo left her former husband and moved in with a friend around that time. The move itself, quite apart from Mungo's testimony concerning her subjective opinions of the state of her marriage, was sufficient for the bankruptcy court to conclude that the marriage was irreconcilably broken by this point. Thus, Judge Wedoff's conclusion was not clearly erroneous.

## VI. THE USE OF DISSIPATED ASSETS

Taylor also challenges Judge Wedoff's findings that the marital estate included certain dissipated assets, arguing that there was evidence that Mungo's former husband used the dissipated assets for legitimate family expenses. Specifically, Taylor points to evidence that, after the couple's separation, Mungo's husband gave her $160,000 in cash support payments, $25,000 for a car, and $15,000 for furniture, and paid $157,500 in taxes and $4,000 in car payments. Some or all of these amounts, Taylor argues, should have reduced the dissipated assets component in Judge Wedoff's calculation of the value of the marital estate.

Under Illinois law, once the court determines that a spouse has liquidated marital assets, the spouse charged with dissipation must establish by clear and convincing evidence that the liquidated assets were used for legitimate family expenses. *See In re Marriage of Cerven*, 742 N.E.2d 343, 348, 317 Ill. App. 3d 895, 900 (Ill. App. Ct. 2000); *see also In re Marriage of Toth*, 586 N.E.2d 436, 439, 224 Ill. App. 3d 43, 48 (Ill. App. Ct. 1991) ("General and vague statements that they were spent on marital expenses or bills are inadequate to avoid a finding of dissipation.").

14

Here, the parties stipulated that Mungo's husband withdrew $213,840.73 from the couple's Quick & Reilly marital account from after late August 1997 to April 2000. Thus, the question is whether Taylor provided clear and convincing evidence that Mungo's husband spent any of this $213,840.73 on legitimate family expenses. Judge Wedoff found that there was an "absence of direct evidence" that these funds were expended on legitimate family living expenses. (*See* R. 1-1, Record, Vol. I, March 22, 2002 Opinion at p. 9.) With due respect to Judge Wedoff, this conclusion was clearly erroneous. In fact, there was direct evidence that certain funds taken from the Quick & Reilly marital account after late August 1997 were spent on legitimate family expenses.

Specifically, Mungo testified that for a period of 13 or 14 months beginning in late August 1997 her former husband gave her monthly checks for $7,650 for support. (*See* R. 1-1, Record, Vol. VI, M. Mungo Direct Test. at pp. 11-12.) An accountant retained by Taylor to examine the Quick & Reilly account confirmed that during this same period Mungo's former husband wrote Mungo six separate checks for $7,650. (*See id.*, Record, Vol. IX, Exhibit 17, at pp. 5-10.) This total of $45,900 from the Quick & Reilly account was clearly spent on legitimate family expenses. *See In re Marriage of Calisoff*, 531 N.E.2d 810, 815 176 Ill. App. 3d 721, 727-28 (Ill. App. Ct. 1988) (amounts paid directly to former wife for support considered legitimate family expenses). Therefore, these six checks totaling $45,900 should have reduced the value of the marital estate to $255,175.73 and reduced Mungo's damages to zero.

Taylor points to other evidence purporting to show that money taken from the Quick & Reilly account after late August 1997 was used for legitimate family purposes, but this other evidence is not clear and convincing. For example, Taylor cites testimony by Mungo that she

15

received from her former husband $15,000 for the children and an unspecified sum of money for a car, (*see* R. 1-1, Record, Vol. VI, M. Mungo Direct Test. at pp. 12, 22), but fails to connect that testimony to specific disbursements from the Quick & Reilly account during the relevant time period. On the other hand, Taylor points to various specific disbursements from the Quick & Reilly account, including purported tax payments, (*see, e.g., id.*, Record, Vol. IX, Exhibit 17 at p. 17), but fails to point to any testimony or other direct evidence showing that those disbursements were made for a legitimate family purpose. Taylor argues that Mungo and her former husband filed joint tax returns during this period, but it does not necessarily follow, for example, that a January 1, 1998 disbursement from the Quick & Reilly account in the amount of $44,050 was in fact made to discharge the couple's joint tax liability. (*See id.*, Record, Vol. IX, Exhibit 17 at p. 17.)[4]

## VII. MUNGO'S DAMAGES THEORY

Taylor argues that Mungo prevailed on a damages theory that she did not raise until closing argument -- namely, that Taylor failed to advise Mungo about the pros and cons of the April settlement agreement -- and that this is somehow improper. In support of this argument, Taylor cites just one case -- *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992). In *Burdett*, the Seventh Circuit overturned a RICO conviction based on an enterprise theory raised not by the parties but by the district court when it entered its findings of fact and conclusions of law. The

---

[4] Taylor also challenges Judge Wedoff's findings that Taylor failed to advise Mungo about the pros and cons of the settlement agreement, that Taylor breached her duty to Mungo in various other respects, and that Taylor's malpractice proximately caused the damages assessed by the bankruptcy court. This Court need not address these arguments, however, because it concludes that, in light of the clear and convincing evidence that some of the allegedly dissipated assets from the marital estate were used for legitimate family purposes, Mungo's damages are zero.

16

Seventh Circuit held that the district court's attempt to inject its own theory of the case after the close of the evidence was improper because it ran counter to the spirit of the adversary system and, more importantly, deprived the defendant of the opportunity to rebut the new enterprise theory. *See id.* at 1380 ("The judge . . . changed the plaintiff's theory of the case after the time had passed for the defendant to present contrary evidence.").

Of course, the present case is not remotely similar to *Burdett*. The theory Taylor complains of was not raised by the bankruptcy court but by Mungo's counsel -- albeit somewhat late in the game. Moreover, Taylor cannot argue that she was deprived of the opportunity to respond to this theory. Indeed, one of the central claims raised by Mungo from the very onset of the litigation was the claim that Taylor signed the settlement agreement without receiving proper legal advice from her attorney because Taylor "pressured" her into accepting the settlement agreement with the specter of $25,000 in attorney's fees. Responding to this theory would have required Taylor to demonstrate that she in fact gave Mungo appropriate legal advice before she signed the settlement agreement. Thus, there can be no argument that Taylor was somehow prejudiced by Mungo's last minute decision to emphasize a different theory of recovery.

## VIII. MUNGO'S TESTIMONY

Finally, Taylor asserts that Judge Wedoff erred when he allowed Mungo to testify that she was coerced by Taylor into signing the settlement agreement and that she did not receive the benefit of proper legal advice from Taylor before signing that agreement. Taylor argues that the doctrine of judicial estoppel bars such testimony because Mungo testified in the underlying state court divorce proceeding that she entered the settlement agreement freely and voluntarily, that no one forced her to enter the agreement, and that she was pleased with Taylor's representation.

17

Judicial estoppel is inapplicable here because, contrary to Taylor's suggestion, the position espoused by Mungo in this case is not "clearly inconsistent" with the testimony she gave in the underlying state court divorce proceeding. *See Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992) (judicial estoppel requires, among other things, that "the later position must be clearly inconsistent with the earlier position"). Mungo's position at trial in this case may be summed up as follows: she admits that she agreed to sign the settlement agreement but she contends that her willingness to do so was the product of Taylor's undue pressure and inadequate legal advice. Mungo's earlier testimony that she entered the settlement agreement freely and voluntarily is not clearly inconsistent with her current conviction that Taylor gave her bad legal advice and pressured her into accepting the agreement.

Moreover, this is not a case where the doctrine of judicial estoppel must be invoked in order to prevent a litigant from prevailing twice on separate, mutually exclusive theories. *See Ogden Martin Systems of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 527 (7th Cir. 1999) ("Judicial estoppel serves 'to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories.'") (citation omitted); *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998) ("[T]he purpose of the doctrine . . . is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant."). To the contrary, Mungo claims that she essentially lost by signing the settlement agreement and seeks to redress that loss with the malpractice action against Taylor.

Finally, as Judge Wedoff recognized, it would make no sense to permit Taylor to invoke the doctrine of judicial estoppel to bar Mungo's testimony because, assuming Mungo's allegations are correct, Taylor's bad legal advice and pressure convinced Mungo to give the

18

testimony in the state court divorce proceeding in the first place. As the bankruptcy court noted, "it would hardly be appropriate for the attorney who gave that bad advice to say that because her client testified in accordance with that bad advice that her client is estopped from asserting that the advice [is] bad." (*See* R. 1-1, Record, Vol. II, September 28, 2001 Order at p. 14.)

## **CONCLUSION**

Judge Wedoff's order as amended is affirmed in part and reversed in part.

DATED: March 6, 2003

ENTERED:

AMY J. ST. EVE
United States District Court Judge